# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 11-1745

_____

State of South Dakota; County of
Roberts; Sisseton School District
No. 54-2; City of Sisseton;
Wilmont School District No. 54-7,

      Appellants,

    v.

United States Department of
Interior; Larry Echo Hawk, in his
official capacity as Assistant
Secretary of Indian Affairs, United
States Department of Interior;
Michael Black, in his official
capacity as Director, Great Plains
Regional Office, Bureau of Indian
Affairs; Russell Hawkins, in his
official capacity as Superintendent,
Lake Traverse Agency,

      Appellees.

_____

Sisseton-Wahpeton Oyate of the
Lake Traverse Reservation,

      Amicus on behalf of
      Appellee.

Appeal from the United States
District Court for the
District of South Dakota.

_____

_____

Before RILEY, Chief Judge, WOLLMAN and BEAM, Circuit Judges.

_____

RILEY, Chief Judge.

The Secretary of the United States Department of the Interior, through the Bureau of Indian Affairs (BIA and, collectively, Secretary), announced its decision to accept four parcels of land within the geographic boundaries of the State of South Dakota (South Dakota) into trust for the benefit of the Sisseton-Wahpeton Oyate of the Lake Traverse Reservation (Tribe), a federally recognized Indian tribe. South Dakota and certain of its political subdivisions (collectively, State) challenged that decision under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-06. The district court[1] granted summary judgment in favor of the Secretary, and the State appeals. We dismiss the appeal.

## I.    BACKGROUND
### A.    Facts

In January 2001, the Tribe's legislative council enacted a series of resolutions requesting that the Secretary exercise its statutory authority under § 5 of the Indian Reorganization Act (IRA), 25 U.S.C. § 465, and certain legislation specific to the Tribe, see Pub. L. No. 93-491, 88 Stat. 1468 (1974), and Pub. L. No. 98-513, 98 Stat. 2411 (1984), to take into trust four parcels of land located in Roberts County, South Dakota. See Sisseton-Wahpeton Sioux Tribe, Tribal Council Resolution Nos. SWST-01-010 to -012, -065. The BIA notified the State of the Tribe's petition, and the State filed comments in opposition to the request.

_____

[1]The Honorable Roberto A. Lange, United States District Judge for the District of South Dakota.

The State objected to Sisseton Agency Superintendent Russell Hawkins' role as the BIA's initial decision-maker with respect to the Tribe's petitions. The State alleged Superintendent Hawkins was impermissibly biased in favor of the Tribe's petition because of his history of governmental service with the Tribe. Superintendent Hawkins is an enrolled member of the Tribe. Before becoming Superintendent in 2001, Superintendent Hawkins served as the elected council chairman for the Tribe.[2] During Superintendent Hawkins' term as chairman, the council passed an ordinance proclaiming the Tribe, "through its inherent and vested authority, [would] exercise jurisdiction over its members and non-members located within Indian Country and Indian Territory of the Lake Traverse Reservation as defined in the 1867 Treaty." Sisseton-Wahpeton Sioux Tribe of The Lake Traverse Reservation, Ordinance No. SWST-ORD-79-02A (1989), available at http://www.narf.org/nill/Codes/sissetonwahpeton%20code/swjurisdiction.htm.[3]

Superintendent Hawkins brought the State's concerns to the attention of the Regional Director of the BIA Great Plains Regional Office (Regional Director). In a September 26, 2006 letter, Superintendent Hawkins explained, "I think as Superintendent I should sign these decision letters . . . but would like your input as to whether or not the [Office of the Field S]olicitor should review" the State's

---

[2]Nearly six years elapsed between Superintendent Hawkins' final term as council chairman and his appointment with the BIA. See South Dakota v. U.S. Dep't. of Interior, 775 F. Supp. 2d 1129, 1139 (D.S.D. 2011).

[3]In 1975, the Supreme Court of the United States held an 1891 act of Congress "terminated the Lake Traverse Reservation, and . . . consequently[,] the state courts have jurisdiction over conduct on non-Indian lands within the 1867 reservation borders." See DeCoteau v. Dist. Cnty. Ct. for the Tenth Jud. Dist., 420 U.S. 425, 428 (1975). The territory encompassed by this tribal ordinance included the cities of Sisseton and Peever, South Dakota, and included lands over which the State had exercised jurisdiction since the 1891 allotment of the Tribe's reservation. See id. at 449.

comments. The Regional Director replied in a November 22, 2006 letter that the State's allegations of bias "hold no validity whatsoever," and

> [t]here is no statute or law that states employees of the [BIA] are not allowed to work on the reservation in which they are enrolled members. We do not see any issues or conflict of interests with Superintendent Russell Hawkins as the Approving Official for On-reservation fee to trust acquisitions for the . . . Tribe.

In January and February 2007, Superintendent Hawkins issued four letters of decision declaring his intention to accept the four parcels into trust on behalf of the Tribe. The State sought review of these decisions with the Regional Director. The Regional Director upheld Superintendent Hawkins' decisions on the merits. Regarding the State's allegation of bias against Superintendent Hawkins, the Regional Director found "the State [did] not submit[] any substantial information to document that any BIA decision maker . . . disregarded any federal regulations or laws" and Superintendent Hawkins was "capable of making a professional and objective decision on [the] fee to trust acquisition[s]."

The State appealed the Regional Director's decision to the Interior Board of Indian Appeals (IBIA). See Roberts Cnty., S.D. v. Acting Great Plains Reg'l Dir., BIA, 51 IBIA 35 (2009). The IBIA rejected the State's bias arguments, remarking that the State "offered no evidence demonstrating that either [Superintendent Hawkins'] membership in the Tribe or his former service as a tribal official improperly influenced his decision," and "the State's bald assumption that [Superintendent Hawkins'] status necessarily calls into question his impartiality is insufficient to demonstrate either the appearance of bias or actual bias." Id. at 49. The IBIA also found the Regional Director's and the IBIA's independent review of Superintendent Hawkins' decision sufficiently protected the State's right "against an erroneous or improper decision." Id. at 49 n.10. The IBIA affirmed the Regional Director's decisions on the merits. Id. at 53.

## B.     Procedural History

Having thus exhausted its administrative remedies, the State brought this action under the APA, seeking to prevent the Secretary from completing the land-into-trust acquisitions.  The State challenged both the Secretary's decision on the merits and Superintendent Hawkins' participation in the decision.

The State alleged, "[t]he States, as part of the constitutional bargain, were implicitly guaranteed, as a matter of binding Constitutional law, due process protections . . . at least equivalent to that" afforded to United States citizens under the Due Process Clauses of the Fifth and Fourteenth Amendments.  The State further maintained

> the States and their political subdivisions are the beneficiary of the Congressional plan providing for delegation of authority to take land into trust only when all litigants or participants in a proceeding seeking to take that land into trust are accorded due process equivalent to that provided by the Fifth and Fourteenth Amendment[s].

The State asserted the Secretary's land-into-trust decision violated its due process rights because "[a]s a result of Superintendent Hawkins' life-long membership in the Tribe and his repeated positions of leadership in the Tribe, Hawkins [could] not . . . act as a neutral, unbiased decision maker with regard to his Tribe's applications to take land into trust."

The BIA filed a motion for summary judgment, which the district court granted.  See South Dakota, 755 F. Supp. 2d at 1132, 1146.  The State appeals.

## II. DISCUSSION

### A. Standard of Review

"We review the district court's grant of summary judgment *de novo*." Morrison Enters., LLC v. Dravo Corp., 638 F.3d 594, 602 (8th Cir. 2011) (quoting Cole v. Homier Dist. Co., 599 F.3d 856, 864 (8th Cir. 2010)). Summary judgment is appropriate where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Id.; see also Fed. R. Civ. P. 56(a). Whether agency action violates the Constitution is a question of law which we review de novo. See Coal. for Fair and Equitable Regulation of Docks on Lake of the Ozarks v. FERC, 297 F.3d 771, 778 (8th Cir. 2002).

### B. Standing

The BIA argues for the first time on appeal the State lacks standing to bring its due process claims. Article III standing is a "threshold inquiry," which must be resolved before reaching the merits of a suit. See City of Clarkson Valley v. Mineta, 495 F.3d 567, 569 (8th Cir. 2007). "To show Article III standing, a plaintiff has the burden of proving: (1) that he or she suffered an injury-in-fact, (2) a causal relationship between the injury and the challenged conduct, and (3) that the injury likely will be redressed by a favorable decision." Pucket v. Hot Springs Sch. Dist. No. 23-2, 526 F.3d 1151, 1157 (8th Cir. 2008) (quoting Steger v. Franco, Inc., 228 F.3d 889, 892 (8th Cir. 2000) (internal quotation marks omitted)); see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

The State's claim satisfies the minimum constitutional requirements for standing. States generally lack authority to regulate Indian tribes and tribe members on trust property. See, e.g., Yankton Sioux Tribe v. Podhradsky, 606 F.3d 994, 1006, 1010-11 (8th Cir. 2010) (recognizing lands taken into trust by the BIA under § 5 of the IRA are Indian country, and "as a general rule Indian country falls under the primary civil, criminal, and regulatory jurisdiction of the federal government and the resident Tribe rather than the states"). As an immediate consequence of placing the

four disputed parcels into trust, Roberts County will lose $254.92, $259.34, $1300.86, and $1474.80, respectively, in annual property taxes. It is reasonably certain the State will be deprived of additional tax revenues, because the State is "categorical[ly]" prohibited from laying a direct tax "on a tribe or on tribal members inside Indian country." Okla. Tax Comm'n v. Chickasaw Nation, 515 U.S. 450, 458 (1995). Thus, the State has a direct and tangible economic interest in the agency's decision. See Akiachak Native Cmty. v. U.S. Dep't of Interior, 584 F. Supp. 2d. 1, 7 (D.D.C. 2008) (recognizing a state's interest in "the loss of taxing and regulatory authority" over lands taken into trust was sufficient to satisfy Article III standing).

To proceed on its claim, the State also must satisfy the prudential standing requirement by showing its alleged injury "arguably fall[s] within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." Bennett v. Spear, 520 U.S. 154, 162 (1997); see also Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co., 522 U.S. 479, 492 (1998).

Because § 702 of the APA by itself does not confer prudential standing, see Rasmussen v. United States, 421 F.2d 776, 779 (8th Cir. 1970) (recognizing the APA does not supply standing), we must determine whether the State is seeking to enforce a right arising out of the Fifth Amendment's Due Process Clause or under the various statutes authorizing the Secretary to acquire land into trust for the benefit of the Tribe. The first question is easily resolved. The State is not a "person" within the meaning of the Fifth Amendment's Due Process Clause. See South Carolina v. Katzenbach, 383 U.S. 301, 323-24 (1966) ("The word 'person' in the context of the Due Process Clause of the Fifth Amendment cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union.").[4] Thus, the State's claim does not

---

[4]The circuits are split as to whether a state's political subdivisions are afforded due process under the Fifth Amendment. Compare In Re Real Est. Title & Settlement Servs. Antitrust Litig., 869 F.2d 760, 765 n.3 (3d Cir. 1989) (holding "school boards are persons within the meaning of the Fifth Amendment due process clause"), with

fall within the "zone of interests" protected by the Due Process Clause, and the State lacks standing to assert such a claim.  See Bennett, 520 U.S. at 162.

Whether the State has standing under the statutes authorizing the Secretary's land-into-trust acquisitions is a more complex question, but it is a question we need not answer now.  The State did not raise any statutory claims on appeal.  In its opening brief, the State framed its argument as follows: "[t]he Due Process Clause prohibits a current member and former multi-term Chairman of the Tribe from adjudicating whether to grant the Tribe's multiple land in trust applications."  The State explained "the State's challenge is centered on the Due Process Clause of the Constitution," and extensively discussed "the proper approach to be taken when evaluating a claim that due process prohibits a decision maker from sitting on a particular case."

In its reply brief, the State referenced its complaint, which asserted the State's right to due process derived from an "implicit" constitutional and statutory guarantee of "due process equivalent to that provided by the Fifth and Fourteenth Amendment[s]."  Because the State failed to assert this theory in its opening brief and has not cited any legal authority plainly demonstrating the existence of such a right,[5]

---

City of E. St. Louis v. Cir. Ct. for the Twentieth Jud. Cir., St. Clair Cnty, Ill., 986 F.2d 1142, 1144 (7th Cir. 1993) (holding "[m]unicipalities . . . are not 'persons' within the meaning of the Due Process Clause" of the Fifth or Fourteenth Amendments).

The State has not argued on appeal or before the district court that its political subdivisions may assert a due process claim in their own right.  While we have some doubt political subdivisions of the state are afforded constitutional rights apart from those which derive from the state itself, we have not decided this issue previously, and we decline to do so now.

[5]Cf. Oklahoma ex. rel. Okla. Tax Comm'n v. Int'l Registration Plan, Inc., 455 F.3d 1107, 1114 (10th Cir. 2006) (rejecting a state's argument that "a universal

-8-

we deem the argument waived.  See, e.g., Primary Care Investors, Seven, Inc. v. PHP Healthcare Corp., 986 F.2d 1208, 1212 (8th Cir. 1993) (explaining under Federal Rule of Appellate Procedure 28(a)(5), a party's failure to specify an error in its opening brief and support its allegations with relevant authority may result in waiver).

### C.     Merits

Because the State lacks standing to bring a constitutional due process claim and does not raise any additional arguments on appeal, the State is not entitled to relief. We express no opinion as to the merits of the State's arguments with respect to Superintendent Hawkins or the validity of the Secretary's decision-making process.

### III.   CONCLUSION

We dismiss the appeal for lack of standing.

_____

---

principle of justice" afforded the state a judicially enforceable right to procedural due process in a federal agency's dispute-resolution proceedings);Az. Dep't of Pub. Welfare v. Dep't of Health, Educ. & Welfare, 449 F.2d 456, 478-79 (9th Cir. 1971) (disapproving a state's argument the Tenth Amendment to the United States Constitution "embodies the State's constitutionally nonexplicit fundamental right[]" to procedural fairness in federal agency proceedings).