# IN THE SUPREME COURT OF IOWA

No. 18–0026

Filed November 30, 2018

**SUSAN E. COX** and **EDWARD A. COX,**

Appellants,

vs.

**IOWA DEPARTMENT OF HUMAN SERVICES,**

Appellee.

_____

Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg, Judge.

Petitioners appeal district court judgment affirming agency ruling imposing Medicaid long-term care eligibility penalties based on their transfer of assets to a pooled special needs trust. **AFFIRMED.**

Rebecca A. Brommel of Brown, Winick, Graves, Gross, Baskerville, and Schoenebaum, P.L.C., Des Moines, for appellants.

Thomas J. Miller, Attorney General, and Matthew K. Gillespie, Assistant Attorney General, for appellee.

Matthew Bollman of Pearson Bollman Law, West Des Moines, and Ron M. Landsman, Rockville, Maryland, for amici curiae National Academy of Elder Law Attorneys, Inc. and Special Needs Alliance, Inc.

**WATERMAN, Justice.**

In this appeal, we must determine whether the district court correctly interpreted the Federal Medicaid Act concerning eligibility for benefits for long-term institutional care. States must adhere to federal eligibility requirements to ensure that benefits are reserved for persons who lack financial means and who have not transferred personal assets that could pay for their care. The petitioners, husband and wife, are disabled and reside in a nursing home. At age sixty-five, they transferred over one-half million dollars to a pooled special needs trust. The Iowa Department of Human Services (DHS) determined the transfers were for less than fair market value and required a delay in their eligibility for Medicaid benefits. An administrative law judge (ALJ) affirmed the determination but required recalculation of the wife's penalty delay. After exhausting intra-agency appeals, the petitioners sought judicial review. The district court affirmed the DHS position, and we retained the petitioners' appeal.

On our review, we conclude the district court and DHS correctly construed and applied federal law requiring the delay in Medicaid benefits for long-term institutional care, effectively requiring the petitioners to tap their pooled trust assets first to pay for their nursing home care. Our determination is based on the plain meaning of the statutory text. Other appellate courts and the federal and Iowa agencies administering Medicaid have reached the same conclusion that Congress chose to treat transfers into pooled special needs trusts by such recipients under age sixty-five differently than transfers by those age sixty-five or older. Substantial evidence supports the DHS finding that the transfers were for less than fair market value. Accordingly, we affirm the district court judgment.

## I. Background Facts and Proceedings.

Edward and Susan Cox, both born in 1950, are a married couple currently living at Westview Care Center in Indianola, Iowa. Both Edward and Susan are disabled and are unable to live on their own. Edward has lymphedema, which causes swelling and makes his left arm unusable. He has had two kidney transplants and takes a number of medications daily. Susan had a stroke, which has induced left-side neglect.

In 2015, Susan received a settlement from a medical malpractice lawsuit relating to her stroke. Edward also received a settlement from the lawsuit for loss of consortium. They decided to transfer most of the funds they received from the settlement into separate pooled special needs trusts with The Center for Special Needs Trust Administration (the Center), a Florida-based nonprofit association. On February 8, 2016, when Edward and Susan were sixty-five years old, they executed joinder agreements for the trust. These joinder agreements created individual subaccounts within the trust for Edward and Susan. Edward's subaccount received $101,921.81 and Susan's subaccount received $474,457.88. The Center is the trustee of the trust accounts and is required to distribute the funds in accordance with the trust documents. The Center may only use the funds in these pooled trusts for Edward and Susan's respective care.

In 2016, around the time the couple moved to the Westview Care Center, Edward and Susan applied for Medicaid long-term care benefits. The couple provided the pooled trust documents to the DHS for review. On June 14, the DHS issued Disposal of Assets Penalty Notices of Decision to Edward and Susan, denying their applications for long-term care benefits on the basis that they "transferred assets for less than fair market value." Edward's notice of decision imposed an eighteen-month and twenty-five-day penalty, making him ineligible for Medicaid long-term care

benefits through July 25, 2017. Susan received a penalty of eighty-seven months and twenty-two days, making her ineligible for Medicaid long-term care benefits through July 22, 2023.

Edward and Susan appealed their notices of decision and requested a hearing. The DHS consolidated the appeals. After the hearing, an ALJ issued a proposed decision finding that because Edward and Susan had made the transfers to the pooled trusts when they were sixty-five and had transferred assets for less than fair market value, they were subject to a penalty period. The ALJ found

> [t]he Department determined the accounts constituted legitimate pooled trusts under 42 U.S.C. § 1396p(d)(4)(c) and, as such, the trusts were generally exempt from Medicaid eligibility rules. However, the Department further determined that the deposits into those subaccounts on February 8, 2016, after Edward and Susan had each turned 65 years old, constituted transfers of assets for less than fair market value requiring the imposition of penalty periods within which neither Mr. nor Mrs. Cox would be eligible for long term care assistance.

The ALJ affirmed the DHS's decision as to Edward. With regard to Susan, the ALJ affirmed the decision that the transfer made her ineligible for Medicaid long-term care benefits, but remanded the matter to the DHS for a recalculation of the penalty period because it improperly included amounts paid for her care prior to the beginning of the penalty period. Under the revised calculation, Susan is ineligible for Medicaid long-term care benefits through April 28, 2023.

Edward and Susan appealed the proposed decision. Charles Palmer, then the director of the DHS, issued a final decision adopting the ALJ's proposed decision in its entirety.

Edward and Susan filed a petition for judicial review challenging the DHS's decision. The district court affirmed the final decision, concluding that the DHS had correctly interpreted the relevant statutory provisions

relating to pooled special needs trusts and found that the transfer of assets after Edward and Susan had turned sixty-five subjected them to penalty periods. The district court also concluded that the DHS interpretation of the relevant statutory provisions did not constitute a per se approach to determining the Coxes' penalties and the DHS had "conduct[ed] an individual review of the record, and concluded that the assets were transferred for less than fair market value."

Edward and Susan appealed the district court decision, and we retained their appeal.

## II. Scope of Review.

Iowa Code section 17A.19 governs judicial review of this agency action. *Iowa Dental Ass'n v. Iowa Ins. Div.*, 831 N.W.2d 138, 142 (Iowa 2013); *see also* Iowa Code § 17A.19 (2016). This case turns on the interpretation of a federal statute, the Medicaid Act. Although the DHS is the state agency administering Medicaid benefits, we decline to give deference to the DHS interpretation of the Act and the DHS's rules and regulations regarding Medicaid. *See Am. Eyecare v. Dep't of Human Servs.*, 770 N.W.2d 832, 836 (Iowa 2009) (declining to defer to the DHS's interpretation of its rules implementing Medicaid). *But cf. Perry v. Dowling*, 95 F.3d 231, 237 (2d Cir. 1996) (granting substantial deference to state agency's interpretation of Federal Medicaid statute as joint federal–state program when "the state has received prior federal-agency approval to implement its plan, the federal agency expressly concurs in the state's interpretation of the statute, and the interpretation is a permissible construction of the statute").

By contrast, we apply federal law on judicial deference to the federal statutory interpretation of the Centers for Medicare and Medicaid Services (CMS), the federal agency administering Medicaid. The CMS interpretation

is set forth in its "State Medicaid Manual" and by opinion letter. The CMS interpretation was not the product of "a formal adjudication or notice-and-comment rulemaking." *See Christensen v. Harris County*, 529 U.S. 576, 587, 120 S. Ct. 1655, 1662 (2000). The Supreme Court has determined that "[i]nterpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference." *Id.*[1] "In *Chevron*, we held that a court must give effect to an agency's regulation containing a reasonable interpretation of an ambiguous statute." *Id.* at 587–88, 120 S. Ct. at 1662. "Instead, interpretations contained in formats such as opinion letters are 'entitled to respect' under our decision in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S. Ct. 161, 164, 89 L. Ed. 124 (1944), but only to the extent that those interpretations have the 'power to persuade.' " *Christensen*, 529 U.S. at 587, 120 S. Ct. at 1663. In *Skidmore*, the United States Supreme Court clarified the level of deference to give to agency opinion letters.

> We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

323 U.S. at 140, 65 S. Ct. at 164.

Accordingly, we will give *Skidmore* deference to the CMS statutory interpretation of the relevant statutory provisions. We will review the

---

[1] *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–44, 104 S. Ct. 2778, 2781–82 (1984).

rulings on statutory interpretation by the DHS and district court for correction of errors at law. *Iowa Dental Ass'n,* 831 N.W.2d at 142–43.

We will apply substantial evidence review to the factual findings of the DHS, which has the authority to determine whether an individual is eligible for Medicaid. *See generally* 42 U.S.C. § 1396a (2012) (establishing requirements for state plans for medical assistance); Iowa Code § 249A.3(11)(*a*) ("In determining the eligibility of an individual for medical assistance, the department shall consider transfers of assets made on or after August 11, 1993, as provided by the federal Social Security Act, section 1917(c), as codified in 42 U.S.C. § 1396p(c)."); *id.* § 249A.4 (enumerating the duties of the DHS director with regard to medical assistance).

> If an agency has been clearly vested with the authority to make factual findings on a particular issue, then a reviewing court can only disturb those factual findings if they are "not supported by substantial evidence in the record before the court when that record is reviewed as a whole."

*Burton v. Hilltop Care Ctr.,* 813 N.W.2d 250, 256 (Iowa 2012) (quoting Iowa Code § 17A.19(10)(*f*)). "In other words, the question on appeal is not whether the evidence supports a different finding than the finding made . . ., but whether the evidence 'supports the findings actually made.'" *Meyer v. IBP, Inc.,* 710 N.W.2d 213, 218 (Iowa 2006) (quoting *St. Luke's Hosp. v. Gray,* 604 N.W.2d 646, 649 (Iowa 2000)).

> On the other hand, the application of the law to the facts . . . takes a different approach and can be affected by other grounds of error such as erroneous interpretation of law; irrational reasoning; failure to consider relevant facts; or irrational, illogical, or wholly unjustifiable application of law to the facts.

*Id.*

### III. Analysis.

We must decide whether the DHS correctly imposed Medicaid eligibility penalties for long-term institutional care after the petitioners, at age sixty-five, transferred assets to a pooled special needs trust. This is a question of federal statutory law. We are not writing on a blank slate—the same legal issue has been adjudicated by the United States Court of Appeals for the Eighth Circuit, the South Dakota Supreme Court, and other courts. We join those courts in holding that the plain meaning of the controlling statutory provision mandates the delay in eligibility.

We begin our analysis with an overview of Medicaid. We then focus on the text of the dispositive statutory provision and the caselaw applying that provision. Finally, we address the remaining arguments for reversal by the counsel for Mr. and Mrs. Cox and amici curiae National Academy of Elder Law Attorneys, Inc. and Special Needs Alliance, Inc.

**A. Overview of Medicaid.** The Medicaid program, established in 1965 and codified at 42 U.S.C. §§ 1396–1396w-5 (the Medicaid Act), "was designed to serve individuals and families lacking adequate funds for basic health services, and it was designed to be a payer of last resort." *In re Estate of Melby,* 841 N.W.2d 867, 875 (Iowa 2014); *see also Ark. Dep't of Health & Human Servs. v. Ahlborn,* 547 U.S. 268, 275, 126 S. Ct. 1752, 1758 (2006) (stating that Medicaid "provides joint federal and state funding of medical care for individuals who cannot afford to pay their own medical costs"). "To be eligible for Medicaid, a person must have income and resources less than thresholds set by the Secretary." *Ctr. for Special Needs Trust Admin., Inc. v. Olson,* 676 F.3d 688, 695 (8th Cir. 2012); *see also* 42 U.S.C. § 1396a(a)(17). "[T]he program contemplates that families will spend available resources first, and when those resources are

completely depleted, Medicaid may provide payment." *In re Estate of Melby*, 841 N.W.2d at 875.

The Secretary of Health and Human Services administers the Medicaid program and "exercises his authority through the Centers for Medicare and Medicaid Services (CMS)." *Ahlborn*, 547 U.S. at 275, 126 S. Ct. at 1758. State participation in the Medicaid program is voluntary, but states choosing to participate "must comply with all federal statutory and regulatory requirements." *Lankford v. Sherman*, 451 F.3d 496, 504 (8th Cir. 2006). "Among these requirements, states must 'comply with the provisions of section 1396p . . . with respect to . . . treatment of certain trusts.' " *Olson*, 676 F.3d at 694–95 (quoting 42 U.S.C. § 1396a(a)(18)).

**B. Pooled Special Needs Trust Provisions.** This case requires us to interpret provisions relating to pooled special needs trusts. Eligibility determinations for Medicaid benefits are complex, with certain requirements for eligibility for general benefits such as medical treatment and additional limitations on eligibility for long-term care in nursing homes. A two-tiered analysis is required. We begin with the general provisions and then address the controlling long-term care provisions.

1. *General Medicaid eligibility determinations.* Medicaid administrators will consider assets held in most types of trusts as available resources for Medicaid general eligibility determinations. 42 U.S.C. § 1396p(d). There are three types of trusts exempted from this general rule. *Id.* § 1396p(d)(4)(A), (B), (C); *see also* Iowa Admin Code r. 441—75.24(3)(*a*), (*b*), (*c*) (providing the same exemptions). At issue here is the pooled special needs trust. 42 U.S.C. § 1396p(d)(4)(C); Iowa Admin Code r. 441—75.24(3)(*c*).

"[A] pooled special-needs trust . . . pays for a disabled person's Medicaid-ineligible expenses, such as clothing, phone service, vehicle

maintenance, and taxes." *Olson*, 676 F.3d at 695. Pooled special needs trusts are "special arrangement[s] with a non-profit organization that serves as trustee to manage assets belonging to many disabled individuals, with investments being pooled, but with separate trust 'accounts' being maintained for each disabled individual." *Lewis v. Alexander*, 685 F.3d 325, 333 (3d Cir. 2012) (quoting Jan P. Myskowski, *Special Needs Trusts in the Era of the Uniform Trust Code*, 46 N.H. Bar J., Spring 2005, at 16, 16). These trusts are "intended for individuals with a relatively small amount of money. By pooling these small accounts for investment and management purposes, overhead and expenses are reduced and more money is available to the beneficiary." *Id.*

Because pooled special needs trusts are not countable as assets for *general* Medicaid benefit eligibility purposes, an individual of any age may place his or her assets into a pooled special needs trust without incurring penalties delaying his or her eligibility for general Medicaid benefits. The statute provides,

> **(d) Treatment of trust amounts**
>
> . . . .
>
> **(4)** This subsection shall not apply to any of the following trusts:
>
> > . . . .
> >
> > **(C)** A trust containing the assets of an individual who is disabled (as defined in section 1382c(a)(3) of this title) that meets the following conditions:
> >
> > > **(i)** The trust is established and managed by a nonprofit association.
> > >
> > > **(ii)** A separate account is maintained for each beneficiary of the trust, but, for purposes of investment and management of funds, the trust pools these accounts.
> > >
> > > **(iii)** Accounts in the trust are established solely for the benefit of individuals who are disabled (as defined in section 1382c(a)(3) of this title) by the

> parent, grandparent, or legal guardian of such individuals, by such individuals, or by a court.
>
> **(iv)** To the extent that amounts remaining in the beneficiary's account upon the death of the beneficiary are not retained by the trust, the trust pays to the State from such remaining amounts in the account an amount equal to the total amount of medical assistance paid on behalf of the beneficiary under the State plan under this subchapter.

42 U.S.C. § 1396p(d)(4)(C).[2]  The Coxes and amici argue the lack of an age limit in this provision is dispositive and the DHS erred by counting their funds in the pooled special needs trust to delay their eligibility for Medicaid *long-term care* benefits.  We disagree, because the Medicaid Act requires additional steps to determine eligibility for long-term care benefits.  That is where we confront the dispositive age-cutoff.

2. *Medicaid long-term care benefit eligibility.*  "Long-term care assistance is an optional category of Medicaid coverage." *In re Pooled Advocate Trust,* 813 N.W.2d 130, 141 (S.D. 2012).  Long-term care benefits include nursing facility services. 42 U.S.C. § 1396p(c)(1)(C)(i)(I).

When an individual applies for long-term care benefits, the state must conduct additional analysis regarding the individual's transfers of assets.  *Id.* § 1396p(c).  Unlike general Medicaid eligibility determinations, states are specifically required to determine whether an applicant for long-term care benefits transferred assets for less than fair market value within

---

[2]There is, however, an age limit with regard to one of the other exceptions in subsection (d):

> A trust containing the assets of an individual *under age 65* who is disabled . . . and which is established for the benefit of such individual by a parent, grandparent, legal guardian of the individual, or a court if the State will receive all amounts remaining in the trust upon the death of such individual up to an amount equal to the total medical assistance paid on behalf of the individual under a State plan under this subchapter.

42 U.S.C. § 1396p(d)(4)(A) (emphasis added); *see also Olson,* 676 F.3d at 701–02 (discussing the differences between § 1396p(d)(4)(A) and (C)).

the relevant look-back period. *Id.* § 1396p(c)(1)(A). If so, the applicant will be ineligible for long-term care benefits for a penalty period. *Id.* "Although an applicant is ineligible for long-term care benefits during the penalty period, the applicant may be eligible for medical-only benefits during that time." *In re Pooled Advocate Trust,* 813 N.W.2d at 141.

There are certain transfers of assets, set out in § 1396p(c)(2), that will not qualify as transfers for less than fair market value. These transfers are exempt from the ineligibility and penalty period requirements. One exception to the ineligibility requirement for long-term care benefits is a transfer to a pooled special needs trust by an individual under the age of sixty-five.

> **(c) Taking into account certain transfers of assets**
>
> . . . .
>
> **(2)** An individual shall not be ineligible for medical assistance by reason of paragraph (1) to the extent that—
>
> > . . . .
> >
> > **(B)** the assets—
> >
> > > . . . .
> > >
> > > **(iv)** were transferred to a trust (including a trust described in subsection (d)(4) of this section) established solely for the benefit of an individual under 65 years of age who is disabled (as defined in section 1382c(a)(3) of this title)[.]

42 U.S.C. § 1396p(c)(2)(B)(iv); *see also* Iowa Admin. Code r. 441— 75.23(5)(b)(4). This case turns on this age limit for determining countable assets for eligibility for long-term care benefits. The Coxes transferred over one-half million dollars into their pooled special needs trusts after they reached age sixty-five. They therefore missed the safe harbor this statute, by its plain meaning, expressly limits to those under age sixty-five.

When interpreting a statute, we look first to the statute's plain meaning. *State v. Nall,* 894 N.W.2d 514, 518 (Iowa 2017). "When the text

of a statute is plain and its meaning clear, the court should not search for meaning beyond the express terms of the statute . . . ." *State v. Tesch*, 704 N.W.2d 440, 451 (Iowa 2005) (quoting *State v. Schultz*, 604 N.W.2d 60, 62 (Iowa 1999)). If unambiguous, we will apply the statute as written. *Nall*, 894 N.W.2d at 518. We do so here.

Congress placed age limits in certain provisions for Medicaid eligibility, and not others. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Chestnut v. Montgomery*, 307 F.3d 698, 701–02 (8th Cir. 2002) (alteration in original) (quoting *Russello v. United States*, 464 U.S. 16, 23, 104 S. Ct. 296, 300 (1983)); *accord Oyens Feed & Supply, Inc. v. Primebank*, 808 N.W.2d 186, 193 (Iowa 2011). "When interpreting the meaning of the statute, we give effect to all the words in the statute unless no other construction is reasonably possible." *Oyens*, 808 N.W.2d at 193 (quoting *State v. Osmundson*, 546 N.W.2d 907, 910 (Iowa 1996)).

"By the omission of an age limit in the [pooled special needs trust] paragraph of subsection (d), Congress's intent was to permit disabled persons over age 65 to *participate* in [pooled special needs] trusts." *Olson*, 676 F.3d at 702. The court in *Olson* distinguished between an individual's participation in a pooled special needs trust and the individual's temporary disqualification from Medicaid long-term care benefits based on that participation. *Id.*

Edward and Susan argue that the DHS incorrectly interpreted the statutes relating to Medicaid eligibility and pooled special needs trusts and improperly treated the pooled special needs trusts as countable assets for purposes of their Medicaid long-term care eligibility determinations. The

amici argue that the trust provision in § 1396p(d) applies to all trust transactions while the transfer provision of § 1396p(c) applies to all transfers to others. For that reason, the amici contend that § 1396p(c), which penalizes transfers of assets to pooled special needs trusts by individuals over the age of sixty-five, would be inapplicable here.

The Eighth Circuit, the South Dakota Supreme Court, and the Kansas Court of Appeals have already addressed the issue we face today. We find their reasoning persuasive.

The Eighth Circuit, considering both § 1396p(c) and (d), concluded,

> When all paragraphs of the statute are read together, a disabled individual over 65 may establish a [pooled special needs] trust, but may be subject to a delay in Medicaid benefits. Despite the lack of an age limit within paragraph 1396p(d)(4)(C) for purposes of counting resources, Congress intended to exempt transfers of assets into pooled [special needs] trusts from the transfer penalty rules of subsection 1396p(c)(1) only if the transfers were by those under age 65.

*Id.*

The South Dakota Supreme Court reached the same conclusion. *In re Pooled Advocate Trust*, 813 N.W.2d at 142. The court considered CMS's and the Social Security Administration's interpretations of § 1396p(c) and (d), finding these interpretations reasonable and that they "bolster[ed] [the court's] reading of the unambiguous statutory language requiring penalty periods for transfers of assets for less than fair market value into pooled trusts by beneficiaries age 65 or older." *Id.* at 145–46. The court looked specifically to a CMS memorandum, which stated,

> Although a pooled trust may be established for beneficiaries of any age, funds placed in a pooled trust established for an individual age 65 or older may be subject to penalty as a transfer of assets for less than fair market value. When a person places funds in a trust, the person gives up ownership of the funds. Since the individual generally does not receive anything of comparable value in return, placing funds in a trust is usually a transfer for less than fair market value. The

statute does provide an exception to imposing a transfer penalty for funds that are placed in a trust established for a disabled individual. *However, only trusts established for a disabled individual 64 or younger are exempt from application of the transfer of assets penalty provisions . . . .*

*Id.* at 144 (quoting Memorandum from Gale P. Arden, Dir. of Disabled & Elderly Health Programs Grp., Ctr. for Medicaid & State Operations, Balt. to Jay Gavens, Acting Assoc. Reg'l Adm'r, Div. of Medicaid & Children's Health (Apr. 14, 2008)). CMS's State Medicaid Manual also provides,

> Establishing an account in [a pooled trust] may or may not constitute a transfer of assets for less than fair market value. For example, the transfer provisions exempt from a penalty trusts established solely for disabled individuals who are under age 65 or for an individual's disabled child. *As a result, a special needs trust established for a disabled individual who is age 66 could be subject to a transfer penalty.*

*Id.* at 145 (quoting Ctrs. for Medicare & Medicaid Servs., *The State Medicaid Manual*, § 3259.7(B) [hereinafter State Medicaid Manual]). The court concluded,

> Considering the unambiguous language of the statutes, coupled with the reasonable agency interpretations, we conclude that transfers of assets into pooled trusts by beneficiaries age 65 or older may be subject to a transfer penalty period for Medicaid eligibility purposes.

*Id.* at 147. We give the CMS interpretation *Skidmore* deference under federal law. *Skidmore*, 323 U.S. at 140, 65 S. Ct. at 164.

In *Hutson v. Mosier*, 401 P.3d 673 (Kan. Ct. App. 2017), the Kansas Court of Appeals reached the same conclusion and, after "considering all of the provisions of 42 U.S.C. § 1396p together rather than in isolation," held,

> [W]e find the plain language of the statute to mean that a person age 65 or older who transfers assets to a pooled supplemental or special needs trust is subject to the imposition of a transfer penalty under the rules of subsection 42 U.S.C. § 1396p(c)(1) if the transfer is for less than fair market value.

*Id.* at 681. The court "recognize[d] that in some cases the impact of a transfer penalty may seem harsh, [but] the imposition of such penalties are specifically authorized by federal law as well as state regulation, and they serve a legitimate purpose." *Id.* at 682. "[P]ooled trusts are intended to assist individuals with a relatively small amount of money who lack the financial resources to secure long-term care." *Id.* at 681–82. "They are not intended to be vehicles for affluent individuals to use in order to divert scarce Medicaid resources from those truly in need." *Id.* at 682.

A United States District Court recently reached the same conclusion, stating, "The text of (c)(2)(B)(iv) explicitly limits its reach to trusts 'established solely for the benefit of an individual under 65 years of age.'" *Richardson ex rel. Carlin v. Hamilton,* No. 2:17–CV–00134–JAW, 2018 WL 1077275, at *16 (D. Maine Feb. 27, 2018) (quoting 42 U.S.C. § 1396p(c)(2)(B)(iv)), *appeal docketed,* No. 18–1223 (1st Cir. Mar. 22, 2018). "As such, § 1396p(c)(2)(B)(iv) does not immunize transfers of assets into pooled special needs trusts for beneficiaries age sixty-five and older from subsection (c)'s provisions that penalize transfers of assets for less than market value." *Id.* at *17.

We agree with the foregoing authorities. Sections 1396p(c)(2)(B)(iv) and (d)(4)(C) are unambiguous. While an individual age sixty-five and older may establish a pooled special needs trust, the individual may be subject to a delay in Medicaid long-term care benefits if transfers to the trust after the individual reached the age of sixty-five were for less than fair market value.

Congress may have had policy reasons for penalizing such transfers by those age sixty-five or older. Medicaid is "a payer of last resort," and benefits are intended for those who are truly unable to afford medical care. *In re Estate of Melby,* 841 N.W.2d at 875. Congress could reasonably

choose to help younger disabled individuals with longer life expectancies conserve their resources. Conversely, "Congress could have rationally concluded that the benefits of making special needs trusts available to elderly individuals outweighed the burden of the penalty. As it stands, congressional intent—as exemplified by the text of the statute—is clear." *Lewis*, 685 F.3d at 352.

The DHS and the district court properly interpreted the relevant statutory provisions with regard to pooled special needs trusts. We turn next to the Coxes' argument that the DHS erred when it determined the transfers were for less than fair market value.

**C. The Transfer for Less Than Fair Market Value.** The Coxes argue the DHS erred when it determined that the transfers to the pooled special needs trusts were a disposal of assets for less than fair market value. Specifically, they contend the DHS did not conduct an individualized factual analysis to determine whether the deposits were (1) a "transfer or disposal of assets" and (2) for fair market value. Iowa Admin. Code r. 441—75.23(8). We begin with the transfer argument.

1. *Transfer or disposal of assets.* The Coxes argue that their deposits into the pooled special needs trusts were not a "transfer or disposal of assets" under Iowa Administrative Code section 441—75.23(8) because a pooled special needs trust is not listed among the six examples enumerated in that rule.

> "*Transfer or disposal of assets*" means any transfer or assignment of any legal or equitable interest in any asset as defined above, including:
>
> 1. Giving away or selling an interest in an asset;
>
> 2. Placing an interest in an asset in a trust that is not available to the grantor (see 75.24(2) "*b*" (2));
>
> 3. Removing or eliminating an interest in a jointly owned asset in favor of other owners;

4. Disclaiming an inheritance of any property, interest, or right pursuant to Iowa Code section 633.704 on or after July 1, 2000 (see Iowa Code section 249A.3(11) "*c*");

5. Failure to take a share of an estate as a surviving spouse (also known as "taking against a will") on or after July 1, 2000, to the extent that the value received by taking against the will would have exceeded the value of the inheritance received under the will (see Iowa Code section 249A.3(11) "*d*"); or

6. Transferring or disclaiming the right to income not yet received.

*Id.* We agree with the DHS and district court that the Coxes transferred assets within the meaning of this rule when they moved their money into the pooled special needs trust. The transfer falls within the plain meaning of the rule's first sentence, as "any transfer or assignment of any legal or equitable interest in any asset." Edward transferred $101,921.81 and Susan $474,457.88 of their respective cash assets into the trust, thereby relinquishing full control and legal title of their funds in favor of a trustee. We will not disregard the reality of the Coxes' transfers merely because the rule includes a nonexhaustive list of examples without specifically naming pooled special needs trusts.

Our conclusion complies with well-settled canons of construction. "[W]hen a statute uses the word 'includes' rather than 'means' in defining a term, it does not imply that items not listed fall outside the definition." *White v. Nat'l Football League*, 756 F.3d 585, 595 (8th Cir. 2014) (quoting *United States v. Whiting*, 165 F.3d 631, 633 (8th Cir. 1999)); *see also Am. Eyecare*, 770 N.W.2d at 837 ("Generally 'the verb "includes" imports a general class, some of whose particular instances are those specified in the definition.'" (quoting *Helvering v. Morgan's, Inc.*, 293 U.S. 121, 125 n.1, 55 S. Ct. 60, 61 n.1 (1934))). To determine the meaning of "includes" we examine the context in which it is used. *Am. Eyecare*, 770 N.W.2d at 837–38.

Here, the rule's first sentence defines "transfer or disposal of assets" broadly as "any transfer or assignment of any legal or equitable interest in any asset." Iowa Admin. Code r. 441—75.23(8). The list that follows, introduced by the term "includes," gives examples of the general class of transfers covered by the rule, not a closed universe excluding types of trusts not specifically mentioned. Moreover, the Coxes' pooled special needs trust falls within the transfer defined under subsection (2), "placing an interest in an asset in a trust that is not available to the grantor." *Id.* r. 441—75.23(8)(2).

The Coxes' contrary interpretation of rule 441—75.23(8) would render it invalid under the supremacy clause. *See Oberschachtsiek v. Iowa Dep't of Soc. Servs.*, 298 N.W.2d 302, 304 (Iowa 1980) ("State regulations which contravene the federal regulatory scheme are invalid under the supremacy clause."). The Federal Medicaid Act applies to transfers into pooled special needs trusts. *See, e.g.*, 42 U.S.C. § 1396p(c)(2)(B)(iv). We decline to interpret the Iowa rule in a manner that renders it void under federal law. For these reasons, we hold the Coxes' trusts meet the Iowa Administrative Code's broad definition of a "transfer or disposal of assets."

The amici also argue that funding a trust is not a transfer and that

> [n]o transfer occurs when the asset is given to a trustee—it is still available and belongs to the applicant—but it *is* transferred once it is given to a third person (or the trustee can no longer use it for the applicant). *That* is when the penalty period starts—*later,* after a period when the asset was deemed available—and thus rendering the applicant ineligible for a longer period of time.

We disagree. The South Dakota Supreme Court refuted the amici's argument as follows:

> Under 42 U.S.C. § 1396p(d)(4)(C), a pooled trust is "[a] trust *containing the assets of an individual who is disabled . . . .*" (Emphasis added.) While parents, grandparents, legal

guardians, or courts may *establish* a pooled trust for a disabled beneficiary, these third parties may not *fund* the pooled trust with third-party assets. *See* 42 U.S.C. § 1396p(d)(4)(C)(iii). Thus, when a third party places his or her own assets into a pooled trust for the benefit of a pooled trust beneficiary, the trust would not qualify as a[] Medicaid pooled trust in the first place.

*In re Pooled Advocate Trust*, 813 N.W.2d at 146–47.

A United States district court also rejected the amici's argument.

Subsection (d)'s text does not support [the Main Pooled Disability Trust's] assertion that it governs transfers into trusts. Subsection (d) speaks repeatedly and exclusively to transfers *from* trusts—that is funds *outgoing from* trusts (to beneficiaries)—not to transfers *into* trusts. This corresponds to the implication from the subsection's title—"treatment of trust amounts." It stands to reason that an amount does not become a "trust amount" until it is transferred into the trust. [The Maine Department of Health and Human Services] penalizes transfers of funds pursuant to subsection (c) when they are transferred—conceptually prior to the completed transfer and deposit into the trust and conversion into "trust amounts."

*Richardson*, 2018 WL 1077275, at \*16 (footnote omitted).

We find this reasoning persuasive. We conclude that Edward and Susan's deposits into the pooled special needs trusts constituted a "transfer or disposal of assets."

2. *Fair market value.* The Coxes argue that any transfer into the trust was not automatically disqualifying and the DHS failed to conduct a factual analysis to determine whether the funds placed in trust constituted a transfer for fair market value. The Coxes ask us to determine that the assets were transferred for fair market value rather than remanding the case back to the DHS for fact finding.

To avoid the ineligibility period, the Coxes were required to make a showing that

(i) the individual intended to dispose of the assets either at fair market value, or for other valuable consideration, (ii) the assets were transferred exclusively for a purpose other than

to qualify for medical assistance, or (iii) all assets transferred for less than fair market value have been returned to the individual.

42 U.S.C. § 1396p(c)(2)(C).[3]

The Coxes argue there is no evidence that the transfers were made for less than fair market value. The Coxes submitted proposed budgets and argue the funds will be used to purchase items for fair market value. The Coxes argue we should decide fair market value after the trust has spent the money based on the value of the items the trust actually purchases. Further, the Coxes argue that because the trustee monitors the trust and can only use the funds for purchases for fair market value, and because the trustee is unable to use the funds in a way that would jeopardize the Coxes' Medicaid eligibility, the Coxes transferred the assets for fair market value. The Coxes cite various unpublished trial court decisions for the proposition that the agency must conduct a factual analysis to determine if a transfer was for less than fair market value.[4]

In our view, the DHS and district court correctly determined that the Coxes transferred their assets into the pooled trust for less than fair market value. The Coxes admittedly gave up full control over their own funds totaling $576,379 by placing that combined amount into the pooled special needs trust. They will benefit as the trust pays out for their care

---

[3]An individual may also prevent the application of a penalty period if they can show denial of eligibility would cause undue hardship. 42 U.S.C. § 1396p(c)(2)(D). The Coxes have not argued undue hardship, and we do not reach that issue.

[4]*Doe v. State Dep't of Health Care Policy & Fin.*, No. XXXXX (Colo. Dist. Ct. July 31, 2018); *Masters v. Dep't of Human Servs.*, No. 2011-5372-AA (Macomb Cty., Mich. Cir. Ct. Aug. 9, 2012); *Estate of Wierzbinski v. Mich. Dep't of Human Servs.*, No. 2010-4343-AA (Macomb Cty., Mich. Cir. Ct. July 26, 2011); *Beinke v. Minn. Dep't of Human Servs.*, No. CV-14-271 (Minn. Dist. Ct. June 24, 2014); *Peittersen v. Minn. Dep't of Human Servs.*, No. 19HA-CV-11-5630 (Minn. Dist. Ct. Oct. 2, 2012); *Dziuk v. Minn. Dep't of Human Servs.*, No. 21-CV-09-1074 (Minn. Dist. Ct. Feb. 7, 2012); *Doe v. El Paso Cty. Dep't of Human Servs.*, No. SHP 2014-0929 (Colo. Office of Admin. Cts. Jan. 26, 2015); *Doe (Redacted) v. Winona Cty. Dep't of Human Servs.*, No. 186029 (Minn. Dep't of Human Servs. Mar. 13, 2017). None of these decisions are controlling.

over time. But future specified benefits inherently are worth less than present full control over cash on hand.

In the proposed decision, later adopted as the final decision by the DHS, the ALJ addressed whether the transfers were for fair market value. The ALJ found the DHS position to be consistent with state and federal rules and regulations.

> [T]he Department agrees that any funds placed in trust for either of the Coxes which were actually paid for his or her benefit prior to the beginning of the applicable penalty period should be deducted from the amount of the uncompensated transfer which was used to calculate the penalty periods. . . .
>
> The Department's position on this issue is consistent with state and federal rules and regulations and the State Medicaid Manual and, as such, is found to be correct. As noted above, any payments made for a beneficiary's benefit for market value prior to the beginning of the penalty date cannot be considered to have been transfers for less than fair market value. However, once the penalty periods began, all funds that have not been used for a beneficiary's benefit must be considered to have been transferred for less than fair market value. Thereafter, Medicaid law provide[s] an exception from the penalty rules only if all assets transferred for less than fair market value have been returned. 42 USC [§] 1396p(c)(2)(C)(iii); 441 IAC 75.23(5)(c)(3).

In the discussion accompanying the final decision, the DHS director agreed with the ALJ, stating, "[O]nce the penalty periods began, all funds that have not been used for a beneficiary's benefit must be considered to have been transferred for less than fair market value." The South Dakota Supreme Court reached the same conclusion. *In re Pooled Advocate Trust*, 813 N.W.2d at 147.

The DHS determined that transfers to pooled special needs trusts are per se transfers for less than fair market value. The DHS relies on CMS interpretations to support its argument. With regard to fair market value, CMS has stated,

> When a person places funds in a trust, the person gives up ownership of those funds. Since the individual generally does not receive anything of comparable value in return, placing funds in a trust is usually a transfer for less than fair market value.

Ctrs. for Medicare & Medicaid Servs., Dep't of Health & Human Servs., State Agency Regional Bulletin No. 2008-05 (May 12, 2008), *available at* http://www.sharinglaw.net/elder/CMS-d4c.pdf.

> Valuable consideration means that an individual receives in exchange for his or her right or interest in an asset some act, object, service, or other benefit which has a tangible and/or intrinsic value to the individual that is roughly equivalent to or greater than the value of the transferred asset.

State Medicaid Manual § 3258.1(A)(2). Again, we give the CMS interpretation *Skidmore* deference. *Skidmore*, 323 U.S. at 140, 65 S. Ct. at 164.

The DHS argues that, in considering the facts of this case, the transfers were for less than fair market value. The DHS argues the trustee controls how the funds are spent and the Coxes have to pay the trustee for trust maintenance. The DHS also argues the transfers were not made for valuable consideration because the Coxes received nothing in return for their transfers. Finally, from a policy perspective, the DHS argues it should be able to evaluate fair market value at the time the assets are transferred to the trust rather than after the trust funds have been spent.

After reviewing the DHS findings in light of all of the evidence in the record, we conclude that substantial evidence supports the DHS finding that the transfers were made for less than fair market value. The value of readily available assets is greater than the value of assets that are restricted in a trust for future use. Even if the trustee were obligated to pay out trust funds over a period of time, these funds are still worth less than unrestricted cash. The trustee may only use the funds in the pooled

trusts for Edward and Susan's care. Edward and Susan cannot later decide to use some of the funds for other purposes such as paying for the college tuition of their grandchildren. Also, if there are funds left in the trust when Edward and Susan die, the trustee will keep the funds or use the funds to reimburse the State for Medicaid expenses. The funds will not go to the estate to pay estate debt nor will the funds go to beneficiaries of the estate. We conclude the DHS conducted an adequate individualized factual analysis with regard to both Edward and Susan to determine the length of the penalty period.

## IV. Disposition.

For these reasons, we affirm the judgment of the district court.

**AFFIRMED.**

All justices concur except Appel, J., who dissents.

**APPEL, Justice (dissenting).**

I respectfully dissent.

I acknowledge, at the beginning, that the undertaking of making sense of the Medicaid statute is no easy feat. The Act has been called "an aggravated assault on the English language." *Friedman v. Berger*, 409 F. Supp. 1225, 1226 (S.D.N.Y. 1976). And, it has been said that the Act is the equivalent of a "Serbonian bog . . . Where armies whole have been sunk." *Cherry ex rel. Cherry v. Magnant*, 832 F. Supp. 1271, 1273 n.4 (S.D. Ind. 1993) (quoting John Milton, *Paradise Lost*, bk. 2, ll.592–94 (1667)).

While I will not add to the colorful language, I will simply state that I do not find this statute nearly as easy to penetrate as does the majority. I take on our assignment in this case with caution. Based on my review of the entire statutory section in context, however, I come to a different conclusion than the majority. In any event, it is clear to me that the questions posed in this appeal have repeatedly surfaced in administrative appeals in a number of states with mixed results. Authoritative clarification of the dispute would require congressional action or a definitive interpretation from the United States Supreme Court.

**I. Relationship Between Subsections d and c in 42 U.S.C. § 1396p.**

The first interpretive question in this case is the relationship between 42 U.S.C. § 1396p(d) (2012), entitled "Treatment of trust amounts," and § 1396p(c), entitled "Taking into account certain transfers of assets." In order to understand the relationship between these two provisions, a close reading of the statutory language is a prerequisite.

The "Treatment of trust amounts" provision, § 1396p(d), is a comprehensive provision designed to address the question of how trusts will be treated for purposes of Medicaid eligibility. Subsection d begins with a very broad definition indicating that an individual is considered to have established a trust by putting any assets into the corpus. *Id.* § 1396p(d)(2)(A). The subsection then addresses two general categories of trusts, revocable and irrevocable trusts. *Id.* § 1396p(3)(A)–(B).

Assets in a *revocable* trust are considered resources available to the individual in determining Medicaid eligibility. *Id.* § 1396p(d)(3)(A)(i). And, payments from the trust to the individual are considered income of the individual. *Id.* § 1396p(d)(3)(A)(ii). In short, these provisions prohibit the use of revocable trusts to shield assets for the purpose of Medicaid eligibility determinations.

Assets held in an *irrevocable* trust are next considered in subsection d. *Id.* § 1396p(d)(3)(B). To the extent that payments from the assets in an irrevocable trust could be made for the benefit of the individual, that portion of the corpus is considered as resources available to the individual in making Medicaid eligibility determinations. *Id.* § 1396p(d)(3)(B)(i). Further, to the extent payments are made from an irrevocable trust for the benefit of an individual, it is considered income of that individual. *Id.* § 1396p(d)(3)(B)(i)(I). Conversely, if payments are made from an irrevocable trust for any other purpose, it is considered to be an asset transferred by the individual for purposes of subsection c. *Id.* § 1396p(d)(3)(B)(i)(II). Similarly, to the extent there are portions of an irrevocable trust that cannot be used under any circumstances to pay the individual, those portions are considered assets disposed by the individual for purposes of subsection c. *Id.* § 1396p(d)(3)(B)(ii).

Subsection d thus generally eliminates the possibility of using creative estate planning devices to achieve eligibility for Medicaid. In particular, establishing a trust with a residual benefit for heirs, or a trust that only conditionally removes assets from the individual's control, will not work as a tool to avoid restrictions on Medicaid eligibility. But there are three exceptions to the general rule: trusts related to providing benefits to disabled persons; trusts related to certain pension, Social Security, or other income (commonly known as *Miller* trusts); and pooled trusts established for a disabled individual. *Id.* § 1396p(d)(4)(A)–(C). The latter category is germane to this litigation.

Certain pooled trusts are not subject to the unfavorable treatment for Medicaid eligibility purposes under a number of conditions. *Id.* § 1396(d)(4)(C). These pooled trusts must contain the assets of an individual who is disabled; be established and managed by a nonprofit association; maintain a system of separate accounts; be maintained for the sole benefit of individuals who are disabled; and to the extent that amounts remaining in the beneficiary's account upon death are not retained by the trust, pay to the state an amount equal to the total amount of medical assistance paid on behalf of the beneficiary. *Id.*

In this case, there is no dispute that the trusts qualify under § 1396p(d)(4)(C). So, funds in the trust that could in the future be made payable to the benefit of the individual are not considered available for purposes of Medicaid eligibility, and the payment of funds from the trusts are not considered income for purposes of Medicaid eligibility.

I now turn to subsection c. It generally provides that if an institutionalized individual disposes of assets for less than fair market value, the individual is ineligible for medical assistance for long-term care services during a penalty period. *Id.* § 1396p(c)(1)(A). The subsection

further provides that an individual is not ineligible for medical assistance for long-term care under certain exceptions. One set of exceptions relates to transfer of a home to certain family members. *Id.* § 1396p(c)(2)(A). Other exceptions involve a situation where the assets were transferred to a trust described under subsection d solely for the benefit of the individual's disabled child or where funds were transferred to a trust established solely for the benefit of an individual under sixty-five years of age who is disabled. *Id.* § 1396p(c)(2)(B)(iii)–(iv).

It seems to me that the best reading of the statutory provisions in tandem is that, generally, the establishment of a pooled trust itself is not a transfer of assets under the statute. Subsection d clearly outlines the situations under which funds placed in trust are to be considered (1) available to the individual for Medicaid purposes, (2) regarded as income, or (3) considered to have been disposed of and thus subject to the benefit-limiting provisions of subsection c. While the Medicaid statute does not define "transfer," I conclude that if you establish a qualifying pooled trust, no transfer occurs. In short, I think subsection d addresses the question of when and under what circumstances transactions involving a pooled trust established for the benefit of the individual are considered transfers subject to unfavorable treatment for purposes of Medicaid eligibility.

I think this interpretation makes sense. The purpose of subsection d is to lay out the general rules regarding the establishment of trusts for Medicaid eligibility. In contrast, I view subsection c as designed to handle situations where individuals seek to divest themselves of assets for the benefit of third parties while at the same time seeking to qualify for Medicaid long-term care benefits.

I understand there are contrary interpretations. In particular, *Center for Special Needs Trust Administration, Inc. v. Olson*, 676 F.3d 688 (8th Cir. 2012), and *In re Pooled Advocate Trust*, 813 N.W.2d 130 (S.D. 2012), are consistent with the majority opinion and contrary to my approach. These cases, however, do not seem to address the interpretation presented here. By way of example, these courts do not consider that, because their approach implicitly assumes that subsection c applies to all transactions funding a trust, the treatment of assets in § 1396p(d)(3)(B)(ii) would be redundant under their approach. In addition, because they assume that subsection c applies to all transactions funding a trust, a person could simultaneously be penalized for having an available asset and penalized under subsection c for a transfer. For instance, a person who places money into an irrevocable trust in which the trustee can use the money to purchase benefits for the person, *i.e.*, a transaction covered under § 1396p(d)(3)(B)(i), would be penalized for having an available asset and penalized for a transfer. I read § 1396p(d)(3) as providing for *either* an availability penalty or a transfer penalty, but not both.

Finally, I do not think that those courts adequately considered the reasons why § 1396p(c)(2)(B)(iv) may apply to transactions benefitting others but not transactions in which an individual funds her own pooled trust. That provision mentions "subsection (d)(4)" trusts, but the reference, it seems to me, is included because an individual ordinarily could not deposit resources into the pooled trust of another person without incurring a transfer penalty under subsection c. *See id.* § 1396p(d)(3)(B)(ii). The exemption in § 1396p(c)(2)(B)(iv) allows the individual to make such a deposit when the other person is disabled and under age sixty-five. *Olson* did not evaluate that argument. *In re Pooled*

*Advocate Trust*, on the other hand, seems to have missed the import of the argument in stating that third parties could never fund a pooled trust since "a pooled trust is '[a] trust containing the assets of an individual who is disabled.'" 813 N.W.2d at 146–47 (alteration in original) (quoting 42 U.S.C. § 1396p(d)(4)(C)). But if an individual places assets in a trust and names another person as the beneficiary, that person ordinarily has equitable title to the assets. Thus, an individual can fund another person's pooled trust and the assets in the trust can still "contain[] the assets of an individual who is disabled." 42 U.S.C. § 1396p(d)(4)(C).

There is one case, however, where the issues raised here have been addressed, at least in part, and that is *Richardson ex rel. Carlin v. Hamilton*, No. 2:17-CV-00134-JAW, 2018 WL 1077275, at *16 (D. Me. Feb. 27, 2018), *appeal docketed*, No. 18–1223 (1st Cir. Mar. 22, 2018). The district court in *Richardson* decided the case adverse to the individual establishing the trust. This case, however, is on appeal to the United States Court of Appeals for the First Circuit.

Although it is not completely clear, it appears that the majority opinion turns on federal rather than state law. In relying on federal law, the majority cites *Skidmore* deference. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40, 65 S. Ct. 161, 164 (1944). None of the parties in this litigation claimed that *Skidmore* deference should be afforded to interpretations of the statute by Centers for Medicare & Medicaid Services (CMS). In any event, *Skidmore* deference is a weak rather than robust doctrine. It turns on the ability of the agency to persuade. *United States v. Mead Corp.*, 533 U.S. 218, 227–28, 121 S. Ct. 2164, 2171–72 (2001). I am not persuaded by the CMS analysis in this case and do not find that any *Skidmore* deference saves the day for the State.

I also want to mention briefly the practical effect of the approach adopted here. If an individual places funds in a qualified pooled trust, the funds will be used during the lifetime of the individual only for supplemental benefits that Medicaid authorizes to be provided without affecting Medicaid eligibility. Upon death, if there are funds remaining in the trust corpus not retained by the nonprofit managing the trust, the funds are used to reimburse Medicaid for benefits provided to the recipient. As a result, the qualified pooled trust does not put Medicaid in an inferior position with respect to the assets, but ensures that Medicaid is in the first position to be reimbursed for expenses in the pooled trust that have not been expended on approved supplemental expenses.

As such, I believe that the decision of the director of the department of human services is based upon an erroneous interpretation of 42 U.S.C. § 1396p(c)–(d) and that interpretation of those provisions is not clearly vested in the agency's discretion. Therefore, I would reverse that decision. *See* Iowa Code § 17A.19(10)(*c*) (2016).

## II. Transfer for Fair Market Value.

Even assuming the establishment of the trust in this case amounted to a transfer under subsection c, there is a question whether the individual establishing the trust received fair market value for the assets placed in the trust.

It seems to me that the Coxes received fair market value for their assets. As a result of their establishment and funding of the trust, they received the investment and management services of a trustee and a method for financing the provision of supplemental services that Medicaid does not provide but does not regard payment for as income affecting Medicaid eligibility. There is no reason to think the Coxes took a haircut on their assets, and nothing that they have done is designed to move assets

to the benefit of third parties such as heirs while maintaining Medicaid eligibility.

The Coxes provide a number of unappealed decisions in other states where fact finders adopt a version of the position they advocate here. For instance, in *Peittersen v. Minnesota Department of Human Services*, No. 19HA-CV-11-5630 (Minn. Dist. Ct. Oct. 2, 2012), the district court held that whether an individual received fair market value for assets placed in a pooled trust could not be determined by a per se rule. *Id.* at 6–7. Thus, it rejected the approach of the majority here, namely, that the transfer of assets into a pooled trust is per se not a transfer for fair market value because the use of the assets is restricted. *See id.* To the Minnesota court, an individualized showing is required. *Id.*; *see also Dziuk v. Minn. Dep't of Human Servs.*, No. 21-CV-09-1074, at 2 (Minn. Dist. Ct. Feb. 7, 2012) (holding that state offered insufficient evidence showing assets were transferred for less than fair market value).

A different approach to fair market value was taken by the Minnesota Department of Social Services. In *Doe (Redacted) v. Winona County Department of Human Services*, No. 186029 (Minn. Dep't Soc. Servs. Mar. 10, 2017), a human services judge held that the time for determining fair market value of assets deposited by a seventy-seven-year-old individual in a pooled trust was the time the funds were deposited in the trust. *Id.* at 9. The judge determined that the individual placing the funds in the trust "gained an immediate vested equitable interest in the trust assets, the value of which roughly equaled the value of appellant's interest." *Id.* A similar approach was embraced by the Minnesota district court in *Beinke v. Minnesota Department of Human Services*, No. CV-14-271 (Minn. Dist. Ct. June 24, 2014). The *Beinke* court observed that a seventy-two-year-old individual who placed funds in a pooled trust

received "the value of an equitable interest in the remaining trust assets," as well as the value of the managing and investing services of the trustee and fiduciary. *Id.* at 8. And, in *Doe v. El Paso County Department of Human Services*, Appeal No. SHP 2014-0929 (Colo. Office of Admin. Cts. Jan. 26, 2015), an administrative law judge in Colorado held there was nothing in the department's regulations that required "a full and immediate exchange of value." *Id.* at 9. The Colorado administrative law judge noted that other legally binding documents such as annuities provide for future performance but are considered fair consideration. *Id.* A Michigan administrative law judge has come to a similar result based on similar reasoning. *Estate of Wierzbinski v. Mich. Dep't of Human Servs.*, No. 2010-4343-AA, at 5 (July 26, 2011).

The various unreported district court decisions cited above, of course, are not binding precedent on this court. But they do suggest that the question of fair market value of any transfer in this case is subject to fair debate. I am inclined to believe that absent extraordinary circumstances, the placement of assets in a qualified pooled trust is ordinarily an exchange for fair market value because of the equitable rights retained by the individual.

I believe that the director's determination that the transfers were for less than fair market value is unreasonable, arbitrary, and capricious. Therefore, I would reverse that decision. *See* Iowa Code § 17A.19(10)(*n*).

**III. Conclusion.**

For the above reasons, I would reverse the decision of the district court.